DIETZ (PAYSON v.). See Case No. 10,861.

# Case No. 3,903.

## DIETZ v. WADE et al.

### [3 App. Com'r Pat. 142.]

Circuit Court, District of Columbia. April 12, 1859.

CREDIBILITY OF WITNESSES — RECONCILING DISCREPANCIES — PATENTS — DATE OF INVENTION — REDUCTION TO PRACTICE—VERBAL DESCRIPTION.

[1. Inconsistencies and incongruities in the testimony of witnesses whose general character for veracity has not been impeached should be reconciled, when it can be done without violence, especially when there is no extrinsic reason for suspecting error or fraud. And, if the testimony cannot be reconciled, the presumption of reason, as well as of law, will impute the variance to an innocent misconception, rather than to a willful and corrupt misrepresentation, especially when the witnesses are compelled to make their answers to an ingenious and artful examination through the medium of an interpreter.]

[Cited in Gibbs v. Johnson, Case No. 5,384.]

[2. Under the act of 1836, § 15, a verbal description of an invention to a workman, such as will enable him to construct the same, together with an order to do so, which is accordingly proceeded in by him, is sufficient to entitle the inventor to a reasonable time for making experiments to perfect his invention; and where such experiments are successful, and the invention is embodied in a machine, the inventor is entitled to claim his invention as of the date of such description and order, as against a subsequent inventor who first perfected the machine and has obtained a patent therefor.]

[Cited in Appleton v. Chambers, Case No. 497a.]

[This was an appeal by Michael A. Dietz from a decision of the commissioner of patents, in an interference proceeding between the appellant and W. W. Wade and Charles Burnham, in respect to an improvement in lamps. The decision appealed from awarded priority of invention to the appellees, who had already procured a patent, and refused to grant a patent to the appellant.]

MORSELL, Circuit Judge. An interference in the matter of this case was declared by the commissioner on the 3d of July. 1858, between the patent. granted to Wade and Burnham, April 6. 1858, and the application of the above named M. A. Dietz filed on 22d of June last for the above mentioned improvement, and upon hearing before him he decided priority of invention to said Wade and Burnham, the said patentees, and the application of said Dietz was rejected. From this decision, Dietz has appealed, and the question is now submitted to me by the parties upon written arguments. Mr. Dietz has filed his reason of appeal, which is general, upon the grounds of error both as to the law and fact. As the commissioner has made no objection to this irregularity, it will be passed over. He has laid before me all the original papers and evidence in the case. together with the grounds of his decision and the reasons of appeal.

The issue between the parties being the question of priority only, the decision now to be made must depend upon a correct view of the evidence to be drawn from the testimony offered by the parties, with a due application of the rules of law thereto. The substance of the testimony on the part of the appellant, I proceed to state:

Auguste Kaistner: He worked with a Dietz as a lamp manufacturer ten years. Commenced working on flat wick lamps May, 1857. The deflector was soldered to the chimney band. It did not answer the purpose. The soldering melted, and deflector fell down, and destroyed the lamp. Mr. Dietz gave him an idea, and an order. that the deflector must be fastened to the chimney band without being soldered; told witness to make a roller by which the deflector would be fastened to the chimney band by pressure. The chimney band is fixed together with the deflector by the roller. The roller presses the chimney band down. and at the same time makes a groove in which the deflector is fixed. Dietz told him that the deflector must be fastened to the groove in the chimney band. The groove in the chimney band was to be formed first before the deflector was fitted or placed. The groove was formed by fixing them together at the same time. Witness understood the description or plan sufficiently well to have made one. This communication was made in the beginning of September, 1857. In assigning his reason for stating that as the date at which Mr. Dietz first communicated to him this plan. he says that

he fixes the date because his father lost his employment at that time. In answer to cross interrogatories, he states the particular date at which his father lost his employment, which he says was on Saturday, sometime in September. An almanac being shown to him he then states "I believe it was the 5th. I know it was the first Saturday in the month." This was the 5th. Witness gives a full and minute description of the roller, and its operation, as given to him by Dietz, and states that experiments were made for the purpose of getting up the machine for carrying this plan into operation, which Dietz thought would be best for the purpose, and to be so made as to suit the purpose; that at the request of Mr. Dietz he worked upon a roller formed with a groove to be used for the purpose of making a groove in the chimney band; that he worked on it upon the 15th of October last, or thereabouts; that Mr. Dietz gave him the order to do it, and that he, having charge of the shop, put his brother Henry at it; that it was perfect and complete, so as to operate in the present form, between the 10th and 15th of November last. The lamp top A being shown to him, he says it is identically similar to that testified to by him on the first day of May. 1857. The lamp top B being shown to him, he says that it does embody the plan communicated to him by Mr. Dietz for the purpose of securing the deflector to the chimney band by a groove in the latter. In answer to a question in which he is asked whether Mr. Dietz has in any way changed that mode of securing the deflector to the chimney band since he (Dietz) first communicated it to him, and, if so, in what respects, he says that it is the same, always was the same; nothing changed, with the exception of the milling around the groove. In answer to cross interrogatory, "Were any lamp tops made by Mr. Dietz without solder before that machine was completed?" he answers none were made; that they were prepared to manufacture them about the 15th of November; that they made experiments in or about the middle of October. On his cross-examination as to his knowledge that it was on the 5th of September when the description of the improvement was made to him by Dietz, he answers that he knows that it was the first Saturday in the month; that he went out with his brother on the 21st September on a target excursion. His father was anxious to go with him, but he having left his employment a fortnight previous, and no living, he had not the means. On further cross-examination he says he knows it was a fortnight, because there were two days between. In answer to a direct interrogatory he says, on experimenting, they found the roller was not perfected the first time; they could not get the deflector to stay tight; but there was no other alteration, than a little change in the groove.

Henry Kaistner: He says, in September,

his brother and himself commenced to alter the burners. "I commenced in September to work on these new (machines) burners, on the alteration for the glass holders. The alteration consisted so that the heaters (deflector) should not be soldered." He proceeds to give a description of the machine by which the groove was formed; gives a rough sketch marked "Exhibit C," and of its operation. He says he fixes the time to be in September by the circumstance that he turned out on a target excursion on the 21st September. At that time his brother and himself spoke about these things. His brother first spoke to him about it. That the machine spoken of by him was completed so as to turn out perfect work about the middle of October. He finished it.

Charles H. Dietz: He says that he was acquainted with an improved mode of attaching the deflector to the chimney band claimed to have been invented by M. A. Dietz. It consists in fastening the cone to the chimney band without solder by means of a groove in the chimney band. The lamp top Exhibit 1 is shown to him. He says it embodies the improvement first described. He became acquainted with said improvement about the middle of August, 1857. It was described to witness by Michael A. Dietz. His means of determining the time, "that he started for the western country about the 1st of September (the 5th of September, not later), and some three weeks previous to that he described to him (witness) the mode of putting the cone into the chimney band without solder by means of a groove." Says he has no interest; that M. A. Dietz has no connection with the firm of Dietz & Co. "When the first improved lamp tops were got up, it was with the groove turned in plain, which in some instances allowed the cone or deflector to turn on the chimney band, which was objectionable; and M. A. Dietz then milled them or made a roughness in the groove, to prevent that turning. The lamp top marked 'Exhibit No. 2' (now shown to him) embodies and shows the milling or roughness just described." On cross-examination he says: "I meant to say that we commenced to manufacture the flat wick lamp in spring of '57; commenced manufacturing the lamp top with the improved attachment by means of a groove in the fall of 1857. Have manufactured them ever since." Early in the fall of 1857, he said, he had improved the lamp top, to fix the cone in the chimney band. To a cross interrogatory. "How long since the improved lamp tops have been made by M. A. Dietz?" Answer: "I can't say. We had them early in the fall of 1857, as nearly as I can recollect;" thinks he had made some sales of the smooth grooved lamp top, before they were made grooved or milled. He came back about the last of September from the west.

The evidence on the part of the appellees, it is contended, shows the discovery for

which the patent issued was made about the 11th of September, 1857, and the completion of the machine embodying it the 1st of November following. As it relates to the testimony on the part of the appellees, it is negative in its character, and presenting some grounds for unfavorable presumptions against the claim of the appellant. Without giving it in detail, suffice it to say, the weight it is entitled to will be considered.

The first part of the commissioner's report is taken up in the discussion of the legal position contended for by the counsel for the appellant, "that the device in itself is one of such a character, and so simple in its nature, as that the mere conception or suggestion of the idea constitutes, itself, the invention." Contrary to the position assumed, the examiner regards it as safer to rest upon what have been hitherto deemed the certain tests of invention. If with this view we turn to the legislation of the country we find, by the Acts of 1790, and 1793 and 1836 [1 Stat. 109; 318; 5 Stat. 117],—the leading acts defining the requisites for the patentability of an invention,—they in all cases practicable require, in order to the issuing of a patent, that a drawing and model of the invention shall be furnished. This undoubtedly proceeds on the supposition that any evidence of the fact less decisive would be extremely deceptive and unreliable. Some visible or tangible result is necessary to show that the invention is not a vague conception, —impracticable it may be, or in a shape in which it is incapable of any use to the public,—but that it has been actually realized. The well-settled doctrine of the courts is also to the same purpose. Thus it is laid down broadly by Story, Circuit Justice, in the case of Reed v. Cutter [Case No. 11,645], "that under our patent laws no person who is not at once the first as well as the original inventor, by whom the invention has been perfected, and put into actual use, is entitled to a patent." See, also, a fuller recognition of the doctrine at page 599 in which it is distinctly asserted "that where a patent has been granted to a patentee who did not surreptitiously obtain his knowledge from a prior inventor who was using reasonable diligence to perfect and adapt the invention, in order to defeat it on the ground that the patentee was not the first inventor, some previous inventor must not only have had the idea, but must also have carried the idea into practical operation."

In the case of Washburn v. Gould [Id. 17,214], the same doctrine is again asserted, the court holding the following language: "Although others may have previously had the idea of a machine and made some experiments towards putting it in practice, the person who first brought the machine to perfection and made it capable of useful operation is the inventor, and is entitled to a patent." For further authority see the case of Woodcock v. Parker [Id. 17,971], as cited by

Curt. Pat. § 43, note. The generality of the doctrine thus laid down is indeed qualified by section 15 of the act of July 4, 1836, protecting an inventor who was "using reasonable diligence in adapting and perfecting" his machine "(and whose invention was therefore of a kind which had not been brought into practical operation), as against a patentee who has surreptitiously or unjustly obtained the patent." But the case thus contemplated is not the case before us, for there is no evidence to show that Wade or Burnham had seen any other lamp top of Dietz's than that seen in exhibits, and we cannot conclude from the testimony of Austin and Church that Dietz received the idea of the new burner from Wade's. That provision of the law is therefore inapplicable here. The case before us, we are willing to believe, is that of two independent and honest inventors, and our concern is therefore solely with the question of priority.

The commissioner then proceeds to consider the testimony. He says: "On a careful examination and comparison of the testimony submitted on the part of Dietz, I do indeed find that Dietz had in his mind something of the same method of securing the deflector which constitutes the invention in contest. It is uncertain whether this was communicated by him to Auguste Kaistner in the first conversation held in the beginning of September. But he is so far clear that experiments were made with a 'roller' with which it was the object to fix the deflector to the band by pressure, and, further, it is clear that this was to be done by a groove on the roller forming a corresponding groove in the band around the flange of the deflector. But the great difficulty which appears in the case is that there is no satisfactory evidence, either in the testimony of this or of any other witness, that the conception of effecting the object had been brought to any patentable degree of perfection before the 15th of November, for unless the invention had been so perfected it is clear that the applicant has no right under the law to a preference to an original inventor who has already obtained a patent."

The commissioner then proceeds to state his objections to the testimony for the purpose of making a machine adapted to the embodiment of the improved invention, upon the ground of disparity of statement between Henry and Auguste Kaistner, etc. He says Henry Kaistner's testimony is that he worked on such a roller before the 21st September, while Auguste says that he himself worked on a grooved roller the 15th of October; that, having charge of the shop (as foreman), he put his brother Henry upon it; and that he finished it about the 15th November. Now, this disparity of statement between two witnesses, who seem to have had the same opportunity of knowing the facts, it is somewhat difficult to reconcile. If Henry also worked on the roller in September, it is strange that

Auguste. did not mention it, and it is incompatible with the distinct conception of the invention which is contended for that he should have been from that time until the middle of November in bringing it into practical operation; for Auguste swears explicitly that none of the burners made by the roller before that time answered the purpose; they were all loose on the chimney-band.

The commissioner proceeds then, as he states, to look a little more closely at the testimony of these two witnesses, which he does; but, as I have already stated this testimony in detail, it is deemed unnecessary to copy what the commissioner has said more particularly. He says of the testimony of Charles A. Dietz: "Charles A. Dietz does indeed swear that his cousin M. A. Dietz described to him the proposed attachment before the 5th of September, and explains the delay in producing them of that kind by the fact that the hands were engaged in filling orders, and that it would not do to put them back. If we could rely on this witness' memory, which yet as to other particulars is very defective, and feel assured that the conception of the improvement was then complete, there would still exist strong doubts whether an inventor who from such a cause delays to follow up his invention, to perfect it, and place it in possession of the public, exhibits that diligence which entitles him to a preference to a patentee."

The testimony of Auguste Kaistner, taken in connection with the fact that the two Dietzes, though apparently being so situated as to know, could not depose with more particularity as to the time when the invention was perfected, saying nothing as to the time when a burner was made without solder leads us to the conclusion that Henry was mistaken as to his dates; that, until between the 10th and 15th of November last, Dietz was still engaged in tightening his burner in the chimney band; and that there is no satisfactory evidence that he had before that time succeeded in perfecting his invention. The Hon. Commissioner Holt says: "The conclusions arrived at by the aforegoing very elaborate report are. I am well satisfied, fully sustained by the law and by the testimony in the case. That the existence of an invention cannot be recognized by this office until it has been established by competent proof. That the maxim of 'de non apparentibus et de non existentibus eadem est lex' disposes of the case, where the testimony in kind or degree falls short of the measure uniformly required by the highest legal authorities. An invention, before it can claim the recognition or protection of law, must have been reduced to practice and embodied in some distinct form, which result can only be evidenced by either a written description, drawing, or model. Parol testimony alone will not, for obvious reasons, suffice. This doctrine has been constantly held by the courts, and has guided the administration of this office. I am aware of no decision or dictum to the contrary. The case cited from 14 Pet. [39 U. S.] 448 [Philadelphia & T. R. Co. v. Stimpson] by the counsel of Dietz, instead of assailing this principle, directly supports it. The parol declarations were there received because coupled with two drawings and a model (page 455), and without such association they would doubtless have been rejected as insufficient. I find no authority which would justify a relaxation of the rule because of the simplicity of the invention. There seems to have been neither written description, drawing, nor model of this invention prepared either by the patentees or applicant. It assumed its first tangible and practical form when they began the manufacture of the improved lamp tops. Until then it existed only in the minds of the inventors, or in the loose parol statements which they had made in regard to it." The commissioner supposes from the evidence that the date of the appellee's invention must be considered to be the latter part of October, 1857, and that of Dietz between the 10th and 15th of November, and awards priority of invention to the appellees accordingly.

Before considering the propositions of law thus laid down, I prefer an examination of the objections made by the commissioner to the credit due to the testimony of appellant's witnesses. As to the general character of the witnesses for veracity, there has been no proof offered to impeach it, nor does it appear that there was any sufficient extrinsic reason to suspect their honesty and integrity or fairness. They had been manufacturers of lamp tops for many years, and therefore acquainted with the subject, and their opportunities of knowing and understanding the subject ample. As to the objections of the commissioner on account of disparity of statement and inconsistencies between the two witnesses (Kaistner) as it respects the making and completion of the machine and of the time of making the lamp tops, and the defectiveness of the memory of another witness (Charles H. Dietz), and for which reasons the commissioner has thought proper to reject their testimony, to those points I remark: The rule in all such cases is to consider whether any such apparent inconsistencies and incongruities may not, without violence, be reconciled, especially where there is no extrinsic reason for suspecting error or fraud. If their statements upon examination be found to be irreconcilable, it becomes an important duty to distinguish between the misconception of an innocent witness, which may not affect his general testimony, and wilful and corrupt misrepresentations. The presumption of reason as well as of law, in favor of innocence, will attribute a variance in testimony to the former rather than the latter origin, more especially when the witnesses were unacquainted with our language, and obliged to make their answers to a very ingenious and artful exam-

ination through the medium of an interpreter. The testimony of the three witnesses who testify to the same matter should be taken together. I observe that the commissioner (through inadvertence, no doubt) takes no notice of the part of the testimony of Charles H. Dietz in which he proves that the Kaistners first worked on a machine to produce the fastening of the deflector to the chimney band by a plain groove. This is his answer to the 12th direct interrogatory. He is asked, "What difference, if any, exists in the mode of securing the deflector to the chimney band without solder, between the lamp tops as at first made and those now manufactured by you?" to which he answers: "When we first got them up, we got them up with the groove turned in plain, which in some instances allowed the cone or deflector, to turn in the chimney band, which was objectionable, and Michael A. Dietz then milled them or made a roughness in the groove to prevent their turning." On his cross-examination he was asked: "Are you pretty certain that you had made any sales of the smooth grooved lamp tops at all, before they were made with the groove milled?" He answered: "I think we did. I am pretty sure we did. We sold some." He fixes the time of the transaction first alluded to as being early in the fall, and is assisted in his recollection from the circumstance of the time when he went to and returned from the western country; that Henry Kaistner and his brother Auguste commenced and worked for adapting a machine according to the description of the improved invention as just before given to him with an order so to do in September, and experimented thereon until it resulted in the plain grooved lamp top, which Henry thought in October was perfect, because it was sufficient to prevent the burner from falling down, and of which some were sold. I think the testimony of the three witnesses together is reasonably certain; and also that the machine being found imperfect in some instances, by suffering the deflector to turn around, not being sufficiently tight, was worked on and completed by milling, as stated by the witness, and perfected as now shown by Exhibit B. By taking the testimony together, I think it is also certainly enough proved, the witnesses being corroborative of each other. The commissioner himself says that Auguste Kaistner is so "far clear that experiments were made with a roller with which it was the object to fix the deflector to the band by pressure, and further it is clear that this was to be done by a groove on the roller forming a corresponding groove in the band around the flange of the deflector," and in which they were engaged in perfecting the embodiment of the invention. By this course of considering the testimony, I think the apparent discrepancies may be reconciled and the truth attained.

Thus it will be perceived, from the aforegoing view which I have taken of the testimony, that I think there is satisfactory evidence that M. A. Dietz, as early as the 5th of September, if not earlier, had discovered the invention claimed by him in this issue, and determined to reduce it to practical use by embodying it in a suitably adapted machine; and he described it fully in detail, and explained its operations, to an experienced skilful workman, with orders to him to proceed accordingly, and to do the necessary work; that the workman understood, and would be able to perform it; that, in the same month of September, the workman, together with another equally skilled in such kind of work, commenced their operations and continued the same, with which object in view experiments were made, and this purpose partially accomplished, with the groove turned in plain, and some of the lamp tops according to this plan sold before or by the middle of October following. About this period it was thought necessary that an alteration should be made by some enlargement of the groove, or by milling or roughing it and the flange of the deflector. This work was accordingly done and completed by the 10th or 15th of November following as it appears by Exhibit B, and now before the patent office.

The case of the patentees appears to be of a similar discovery sometime in the month of September of the same year, subsequent to that of the appellant, and his perfected invention about the 1st of November following, which latter he contends was before the perfected invention of the appellants. This then being the case before me on the evidence, the next step will be to consider what are the proper rules of law which ought to govern and be applied.

The position which I set out with is this: that (if as in this issue of interference) where the only question is that of priority of invention, an inventor intending to embody his invention in a suitably adapted machine for that purpose describes it to a skilful mechanic, fully and clearly, so as to enable the workman from that description to construct it, with an order to him so to do, and which is accordingly proceeded in by the workman, the inventor will be entitled to a reasonable time for making experiments in order to perfect his invention, which description and experiments, if successful, must be received and considered as sufficient evidence of an assertion of his right at that time of so making them, although orally made, and although a subsequent independent inventor of the same invention may be so fortunate as to succeed in perfecting the invention and obtaining a patent therefor before him; yet nevertheless priority of invention ought to be awarded to such prior inventor, as the first and original inventor, (and having complied with all the other requisites of the statute), has a right to a patent. This conflicts with the rule laid down (as understood) by the commissioner,

which in substance is that, in the case of independent inventors, he who first perfected his invention though a subsequent inventor, is entitled to the patent. The principal feature in this conflict seems to be as to the nature of the proof; that proof of the origin of the invention by verbal declarations or descriptions was incompetent. though for the purpose merely of ascertaining the time, and made before any controversy had arisen. It is difficult to understand the force of this objection. From the nature of the case it is the best evidence that can be expected. It is the expression of a new principle conceived in the mind, and can only be made known by expression; and, whether that be oral or in writing, it would still be testimony of the same nature. The one might be more certain than the other, but would not be sufficient to reject it, as it might still be sufficiently certain, by giving it form and shape; and, if this is done in a reasonable time, does it not become a part of the res gestae? The expression of it, whether verbal or written, for the purpose of showing the time, is the very thing manifested as existing. For practical purposes, it must, it is true, be reduced to form and shape. All this, I think, is clearly settled in the case of Philadelphia & T. R. Co. v. Stimpson, supra. Justice Story, in delivering the opinion of the court, says: "The invention itself is an intellectual process or operation, and, like all other expressions of thought, can in many cases scarcely be made known except by speech. The invention may be consummated and perfect. and may be susceptible of complete description in words, a month, or even a year, before it can be embodied in any visible form, machine, or composition of matter." etc. Again: "The conversations and declarations of a patentee, stating that he had made an invention, and describing its details, and explaining its operations, are properly to be deemed an assertion of his right at that time. as an inventor, to the extent of the facts and details which he then makes known, although not of their existence at an antecedent time." How makes known? The judge does not say by writing or a machine; he means by words. But the force of this authority for this purpose is supposed to be overcome by the supposed fact that these declarations were accompanied by two drawings and a model. Now, I have carefully looked through the whole case, and I cannot find one word of the kind in any part of the record, either in the statement of the case, in the bill of exceptions, or in the opinion of the court. I have reason, therefore. to suppose they were not in the case. The judge certainly does not place his opinion upon any such fact; and. if they were in the case. it could not materially affect the principle, because the declarations giving the description. etc., are of a higher character, being the thing itself. This case establishes another principle,—that necessary time used for the embodiment of the inven-

tion ought to be allowed without detriment to its origin as prior in time. The commissioner has already stated "that the existence of an invention cannot be recognized by the patent office until it has been established by competent proof, which he defines to be something more than parol testimony alone, such as a written description, drawing, or model, or, in other words (if intended to meet the point before him), something more than a full and clear verbal description, with the commencement of the work on a machine to reduce it to practical use and with a successful result." The conclusion to be drawn from that position is that, as between inventors as in this case, on an issue of priority, he who first perfects the invention by a practical use is entitled to a patent. With all due respect, I cannot think so. Such a rule, I think, would operate unequally, unjustly, and oppressively, and subversive of the good old rule, "qui prior est in tempore potior est in jure." No just value would be placed upon the incipient rights of the party, in which, although the inventor has no exclusive property at the time, the law regards as an interest which he may perfect, and such as is within the provisions of the act of congress of 1836. respecting assignments. This principle is decided by the supreme court in the case of Gaylor v. Wilder [10 How. (51 U. S.) 477], in which case Judge Taney says: "The discoverer of a new and useful improvement is vested by law with an inchoate right to its exclusive use, which he may perfect and make absolute, by proceeding in the manner which the law requires." I wish not to be understood that this case is referred to by me to show that the invention, whilst in a merely intellectual stage. is assignable, but to show that it is recognized by the patent law whilst it is in being practically prepared to obtain the patent.

Several authorities of decided cases have been referred to and relied on by the commissioner to support the grounds taken by him, which I think are very much misunderstood. The first case I notice is that of Reed v. Cutter [Case No. 11,645]. In his quotations from this decision of the judge (as before recited by me) the commissioner omits to state the very next sentence following the one he did state, and I think states more fully the meaning of the judge. It is this: "A subsequent inventor, although an original inventor, is not entitled to any patent if the invention is perfected and put into actual use by the first and original inventor." So as to the other passage. The commissioner seems to consider the judge as deciding the application of the qualification contained in section 15 of the act of 1836 was solely confined to the case of a second inventor who had surreptitiously or unjustly obtained the patent. And. as this was not a case of that kind. the first inventor in this case could not avail himself of the fact of due diligence, etc.

I think it is clear that no such conclusion can be drawn. At page 599, noticing the reference to the passage in Philips on the subject of this section 15, the judge says: "These latter words 'was using reasonable diligence in adapting and perfecting the same' are copied from the 15th section of the act of 1836, c. 357, and constitute a qualification of the preceding language of that section, so that an inventor who has first actually perfected his invention will not be deemed to have surreptitiously or unjustly obtained a patent for that which was in fact first invented by another, unless the latter was at the time using reasonable diligence in adapting and perfecting the same; and this I take to be clearly law." The construction given by the commissioner would in effect be to give a greater immunity to a dishonest inventor than to an innocent independent one. The following part also of the same opinion makes it clear that the judge had no such meaning. On page 600 he says that in a race of diligence between two independent inventors, he who first reduces his invention to a fixed, positive and practical form would seem to be entitled to a priority of right to a patent. Therefore, the clause of section 15 now under consideration seems to qualify that right by providing, in such cases, he who invents first shall have the prior right if he is using reasonable diligence in adapting and perfecting the same, although the second inventor has in fact first perfected the same, and reduced the same to practice in a positive form. It thus gives full effect to the well-known maxim, "that he has the better right who is prior in point of time," namely, in making the discovery or invention. But if, as the argument of the learned counsel insists, the text of Mr. Philips means to affirm (what I think it does not) that he who is the original and first inventor of an invention so perfected and reduced to practice will be deprived of his right to a patent in favor of a second and subsequent inventor simply because the first invention was not then known or used by other persons than the inventor, or not known or used to such an extent as to give the public full knowledge of its existence, I cannot agree to the doctrine, for, in my judgment, our patent acts justify no such construction. It is hardly possible to conceive a stronger decision in favor of the position laid down by me in the first part of the discussion than the one just recited. It may not be amiss to state the construction of this section 15 of the act of 1836 given by Philips on Patents, at page 395. He says: "By looking at the former part of the section, we find that the patentee must be the 'original and first inventor.' The construction of the two parts of the section, taken together, is, then, that if the patentee was the original inventor of the thing patented, his patent shall not be defeated by proof that another person had anticipated him in making the invention, unless it also be shown that such person was adapting and perfecting his invention; or, in other words, if the patentee was an inventor of the thing patented, he shall not in such case be considered as having surreptitiously or unjustly taken out a patent for what was invented by another." The next is the case of Washburn v. Gould [Case No. 17,214], which the commissioner truly says asserts the same doctrine, and I think nothing more. And the next case is that of Woodcock v. Parker [Id. 17,971]. The judge says: "In the present case, as the defendants claim their right to use the machine in controversy by a good derivative title from Samuel Parker, if the jury are satisfied that said Parker was the first and original inventor of the machine, the plaintiff cannot, under all the circumstances, maintain his action, notwithstanding he may have been subsequent inventor, without any knowledge of the prior existence of the machine, or communication with the first inventor. It is not necessary to consider whether, if the first inventor should wholly abandon his invention, and never reduce it to practice, so as to produce useful effects, a second inventor might not be entitled to the benefit of the statute patent, because there is not the slightest evidence of such abandonment." It is difficult to conceive what of this decision the commissioner can think supports his proposition. There certainly has been no proof of abandonment; on the contrary, as before said, a following up ever since the discovery of efforts to adapt it to practical use, and perfect and prepare it for patentable application, according to the requirements of the statute, and which efforts have been completely successful. With respect to the question of diligence each case must depend upon its own circumstances. There is certainly no sufficient evidence that Dietz, the inventor, had wholly abandoned his invention; that he suffered his invention to rest in mere theory or in intellectual notion or in uncertain experiments, but in due time reduced it to practice, and embodiment. The discovery was in September, and the invention perfected early in the November following. The similar work occupied the appellees nearly the same length of time. I cannot say it was unreasonable. In support of his case the appellant's counsel referred to a great number of authorities, and some were referred to on the part of the appellees; but I have chosen to rest my opinion alone on those cited by the examiner and commissioner as entirely sufficient, and therefore shall not take a particular notice of others.

In conclusion, I am satisfied that the appellant has made out his case both upon the law and the facts, and that he is entitled to a patent accordingly.